# A

UNITED STATES DISTRICT COURT
FOR THE STATE OF RHODE ISLAND

MICHAEL F. GRADY, a
Rhode Island domiciliary,

Plaintiff,

CASE NO. CA 07-237S

v.

EDWARD GOLDBERG, a
New Jersey domiciliary,
MINDY GOLDBERG, a
New Jersey domiciliary, and
UNIVERSAL SOURCING,
INC., a New Jersey corporation,

Defendants.

**AMENDED COMPLAINT FOR DAMAGES**

The Plaintiff, MICHAEL F. GRADY ("Grady"), appearing Pro Se on behalf of himself, and pursuant to the Federal Rules of Civil Procedure and the Local General Rules of the United States District Court for the State of Rhode Island, serves this his Amended Complaint for Damages against the Defendants, EDWARD GOLDBERG ("Goldberg") and MINDY GOLDBERG ( "Mindy Goldberg") and UNIVERSAL SOURCING, INC. ("USI") and alleges as follows:

**GENERAL ALLEGATIONS**

**The Parties**

1. Goldberg is a citizen and domiciliary of the State of New Jersey. He is of the age of majority, and, otherwise, sui juris.

2. Mindy Golderg is a citizen and domiciliary of the State of New Jersey. She is of the age of majority, and, otherwise, sui juris.

3. USI is a corporation organized and formed in the State of New Jersey. It has its principal place of business in the State of New Jersey. However, it conducts substantial but not isolated business in the State of Rhode Island, and, consequently it is subject to in personam jurisdiction in the State of Rhode Island.

4. Goldberg is subject to in personam jurisdiction in the State of Rhode Island as he has conducted substantial but not isolated business in the State of Rhode Island. Goldberg, by e-mail and telephone, made representations and admissions to Grady knowing Grady was in the State of Rhode Island with regard to the transaction which is the subject matter of this Amended Complaint for Damages. Moreover, on several occasions over several years, Goldberg traveled to Rhode Island to discuss the subject transaction with Grady and others.

5. Mindy Goldberg is subject to in personam jurisdiction in the State of Rhode Island as she has conducted through Goldberg who acted as her agent with full consent, approval and authority to negotiate the subject transaction in the State of Rhode Island. Mindy Goldberg, through Goldberg, by e-mail and telephone, made representations and admissions to Grady in the State of Rhode Island with regard to the transaction which is the subject matter of this Amended Complaint for Damages. Moreover, on several occasions over several years, Goldberg, as the agent for Mindy Goldberg, traveled to Rhode Island to discuss the subject transaction with Grady and others.

6. Grady is a citizen and domiciliary of the State of Rhode Island. He is of majority age and otherwise, sui juris.

<u>Jurisdiction and Venue</u>

7. This is a cause of action between citizens and domiciliaries of different states and the amount in controversy exceeds the value of $75,000.00, exclusive of interest and costs, and,

consequently, there is subject matter jurisdiction pursuant to 28 U.S.C. 1332.

8. Venue is appropriate pursuant to 28 U.S.C. 1391 because a substantial part of the events or admissions giving rise to the Amended Complaint for Damages occurred within this judicial district. Moreover, USI maintains an office in East Greenwich in the State of Rhode Island, and, USI conducts substantial but not isolated business in the State of Rhode Island.

9. Moreover, Goldberg, by e-mail, telephone and in person, and Mindy Goldberg, through Federal Express, made representations to Grady with regard to the transaction which is the subject matter of this cause of action in the State of Rhode Island.

**Material Facts Common to All Causes of Action**

10. On or about February 1997, Goldberg, on behalf of Mindy Golderg, offered Grady the opportunity to own 50% of USI in exchange for which Grady would pay to USI his 50% of the net profits he earned on transactions that he brokered through other suppliers of premiums. Prior to his agreement to acquire an ownership interest in USI, Grady procured premiums such as fanny packs, cameras, CD players, radios, wratchet sets, coolers, flashlights and other similar type promotional products brand named for clients such as Time Magazine to promote goodwill for those clients.

11. On December 4, 1995, Goldberg first approached Grady to run his premium sales through USI. Based upon that conversation, Goldberg and USI sent samples to Grady. In fact, on or about December 27, 1995, Grady gave the first order to Goldberg and USI for premiums to be sold to customers of Grady. During all of 1996, USI and Grady split profit percentages on all commissions earned through sales made through USI with USI premiums on a 50%-50% basis.

12. Beginning in March of 1996, Goldberg constantly called Grady requesting that he

become a partner in USI. Finally, in late 1996, Grady agreed to the partnership relationship on a 50%-50% basis.

13. Beginning in February of 1997, Grady began to broker all of his sales activities through USI, if possible, and, when not possible, agreed to have other vendors pay commissions to USI instead of Grady personally as he had done in the past. It was agreed between Grady and Goldberg that they would put all of their efforts, time and resources into USI, including all business related activities and all assets and aspects of the business would be shared equally between Goldberg and Grady, even deals placed in by another salesman, Keith Rosenzweig.

14. Goldberg was advised that because Grady was a single parent of a three (3) year old son that he could not travel as much as in the past and that his sales volume would go down, and therefore, he would be able to help more with the organization, management and finances of the business as the relationship moved forward allowing Goldberg to concentrate more on sales.

15. Goldberg was to work on the written agreement to document the deal. However, by July, 1997, Grady threatened to stop doing business with USI because the written agreement was not completed. On August 1, 1997, in response, Goldberg sent Grady a financial report for USI to show him how the company of Grady and Goldberg was performing. Goldberg promised he was working on the written agreement.

16. For the remaining months of 1997, Grady and Goldberg would meet in New Jersey and Rhode Island to continue to discuss the written agreement and other aspects of USI.

17. By December, 1997, Grady once again threatened to leave USI, but, Goldberg insisted that because of their friendship, Grady should trust Goldberg to get the agreement committed to writing as soon as possible because in the words of Goldberg: Grady makes the rain and Goldberg catches the raindrops.

18. Also, in December of 1997, Goldberg asked Grady to personally guarantee a $150,000.00 loan for USI with some private lenders to which Grady consented. The loan was paid and Grady was given a release on March 26, 2001.

19. By September, 1999, Grady was totally fed up with the stumbling and lack of the appropriate agreement and made an appointment with Goldberg to meet with Edward Perioni, Esquire, a CFP and tax lawyer in Providence to discuss how to structure the agreement and avoid any adverse tax implications to Grady, Goldberg, Mindy Goldberg or USI. This meeting with Mr. Perioni was held at the offices of Mr. Perioni in Providence, Rhode Island on or about September 21, 1999, and, it was attended by Grady and Goldberg, as agent for Mindy Golderg. Grady and Goldberg discussed at length with Mr. Perioni the agreement by which Grady was to receive 50% of the shares of stock in USI. At this meeting, Goldberg admitted that he, on behalf of his wife, had authority to enter into a sales agreement. Mr. Perioni sent his plan in writing in October, 1999 to Grady and Goldberg, and, Goldberg told Grady that Goldberg wanted other attorneys to review the plan.

20. In December, 1999, Goldberg asked Grady for a personal financial statement which Goldberg said USI needed to get the agreement done which Grady complied with on January 6, 2000.

21. Again, in early 2000, Grady threatens to leave and Goldberg forwards an agreement in writing to Grady with regard to the transfer of the stock. The agreement between Goldberg and Grady was that money would change hands on paper only as Grady had already built up a huge equity in terms of additional commissions paid to the company over the previous three (3) years from when the agreement was originally made. The consideration for the transfer was confirmed by all parties at the meeting at the offices of Mr. Perioni, in his presence.

22. On June 18, 2000, Grady sent an e-mail to Goldberg demanding that the deal be performed by the end of that week.

23. In September, 2000, it was agreed amongst Grady, Goldberg and Keith Rosenzweig that the three would invest $80,000 a piece for a percentage of a manufacturing plant in China. The shares would be owned by Goldberg, Grady and Keith Rosenzweig. In fact, on February 12, 2001, Goldberg recommended a law firm to assist Grady, Goldberg and Keith Rosenzweig with their investment in this manufacturing plant in China from Mr. Chu Pin.

24. Sometime in May, 2001, Goldberg advised Grady that the officers at Commercial Capital Bank had been aware of the transfer of the stock and Commercial Capital agreed to the transfer.

25. By December, 2001, the written agreement had not yet been finalized. On or about December 15, 2001, Goldberg finally agrees to use a form agreement previously drafted by counsel that Goldberg had chosen.

26. During the week of December 20, 2001, the agreement was negotiated over the phone. Finally, the agreement was negotiated at the conference table at the office of Grady in Johnston, Rhode Island where Grady and Goldberg also met with a computer consultant to discuss a new network computer program for the company to be accessed from the offices located in New Jersey, Rhode Island, Scottsdale, Arizona, as well as, anywhere else in the world, including China, where there is access to the internet. Again, Goldberg was present in Rhode Island to negotiate and review the terms of the agreement for the sale of the 50% interest and transfer of stock in USI with Grady.

27. On January 14, 2002, Goldberg sent an e-mail to Grady in Rhode Island indicating that his counsel was working on the agreement as well as a proposal to show lenders

for USI that the closing on the agreement between Mindy Goldberg and Grady would occur in mid February. Grady insisted that he was told in mid 2001 that the numbers had been completed and all that had to be done was to put the paperwork together. Grady insisted that if there was a problem with the bank that Grady be permitted to speak to the bank That same day, Goldberg confirmed that Goldberg, Grady and Keith Rosenzweig each owned one-third (1/3) of a 49% interest in the manufacturing plant in China. Goldberg has never delivered any representation of the ownership interest in the China manufacturing plant to Grady.

28. On February 15, 2002, Goldberg and Grady agreed that a $30,000 loan that had been made by Grady to USI in June, 2001 can be considered as a transaction for the payment of the stock in the agreement even though the actual consideration was the equity that Grady had built up in the company since February, 1997 by contributing portions of his commissions to USI in order to grow the company. Goldberg insisted that USI needed to show its lenders a transaction for the transfer of the shares and that the $30,000 number would work, and, that the explanation for contribution of commissions to Capital would be too difficult to explain.

29. On February 21, 2002, Goldberg promises to have the agreement finalized by Monday of the next week. On February 26, 2002, Grady threatens to leave USI and demands that all of his orders for his customers be stopped and demands that no-one from USI contact his customers.

30. In response to several Goldberg e-mails, Grady indicated that he was concerned about a UCC filing. Goldberg confirms with Grady that 50% of the shares are Grady's. Goldberg's biggest concern was about the loan being called, because Mindy Goldberg sold some of the business without consent of the bank, although it was indicated that the bank had consented months and months prior.

31. Goldberg has denied that over ten (10) months ago, Goldberg had informed Grady that the transfer of stock had been approved by Capital and that all they needed was a personal financial statement from Grady, which was provided.

32. On February 26, 2002, Goldberg wrote another e-mail to Grady which stated as follows:

> "Mike: I read your e-mail from this morning and I am sorry for disrespecting you, it was not done intentionally. I was doing a lot of thinking last night and put myself in your shoes and understand how you feel. I want you to know that for almost 7 years that I have treated and thought of you only as an equal, as my partner (I hope that does not sound ____). I am sorry for not giving this enough priority. I look at our partnership as a lifelong agreement and I just want to make this right. Call me when you get this."

33. Two (2) days later on February 28, 2002, Grady received by Federal Express a signed agreement effective as of January 1, 2001 from Mindy Goldberg. In addition, Mindy Goldberg had forwarded an original stock certificate for 50% of the interest in USI to Grady which was also signed, executed and endorsed by Mindy Goldberg. Mindy Goldberg was the one who forwarded this documentation to Grady by Federal Express which was received by Grady at the USI offices in Johnston, Rhode Island.

34. When the shares of stock were delivered to Grady, consistent with the representations and warranties made by Mindy Goldberg in the Agreement, the USI shares would be free of all liens. Moreover, Mindy Goldberg, in the Agreement, had warranted and represented that she had the actual authority and power to sell and transfer the shares for 50% of USI to Grady. Indeed, these are the very same representations made by Goldberg, as agent for Mindy Goldberg, to Grady. Notwithstanding the Agreement reached between Mindy Goldberg, Goldberg, USI and Grady, the Goldbergs and USI have failed and refused to honor the ownership interest of Grady in USI. In particular, Mindy Goldberg represented, in writing, in

the Agreement, which was delivered to Grady in Rhode Island, the following:

> Seller, [Darlene Mindy Goldberg] owns two thousand (2000) shares (the "Issued Shares") of common stock, no par value, of UNIVERSAL SOURCING, I NC., (the "Corporation") representing all of the Issued and outstanding shares of the Corporation, and
>
> WHEREAS, Purchaser desires to purchase 50% of the Issued Shares (i.e. 2000 shares, the "Shares"), and the seller desires to sell the Shares to Purchaser, pursuant to the terms and conditions of the agreement.
>
> Sale of the Shares. Seller hereby sells to the Purchaser, and Purchaser hereby purchases from Seller, the Shares for the price and upon the terms and conditions set forth in the Agreement.
>
> ••••
>
> Delivery of the Shares. Seller has simultaneously herewith delivered the Shares to Purchaser. To accomplish such delivery, Seller has tendered the certificate for the Shares together with the necessary stock power. Purchaser shall be responsible for obtaining and affixing any required stock transfer stamp.
>
> ••••
>
> Representations
>
> 5.1 Seller. Seller hereby represents and warrants to Purchaser that:
>
> 5.1.1 She owns the Shares are free and clear of all liens and encumbrances.
>
> 5.1.2 She has full power and authority to execute, deliver and perform this Agreement, including the sale of the Shares.
>
> 5.1.3 No brokers or agents were involved in connection with her sale o f the Shares to Purchaser or otherwise in connection with the negotiation, execution, delivery or performance of this Agreement.

35. Moreover, they have failed and refused to provide financial information, as well as the necessary information for Grady to file his tax returns, including, but not limited to, forms

W-2 and the K-1 statements required to be delivered to shareholders of a SubChapter S corporation.

36. As a proximate cause of the misrepresentations made to Grady by the Goldbergs and USI, Grady has suffered substantial damages, including, but not limited to loss of income because of the distribution of profits to USI from outside transactions with other brokers and the inability to obtain certain tax advantages through the delivery of his forms W-2 and K-1 to Grady from USI. 37. Moreover, USI, Goldberg and Mindy Goldberg have usurped patents for various products which were invented and designed by Grady, Goldberg and Keith Rosenzweig, another employee of USI. Instead of having those items patented by the three (3) inventors, Goldberg, Grady and Keith Rosenzweig, Goldberg had the patents put in his own name.

38. Any and all conditions precedent to the initiation of this action have been performed, occurred or were waived.

**COUNT I**

**FRAUD IN THE INDUCEMENT**

39. Grady realleges and incorporates herein by reference the General Allegations.

40. USI, Goldberg and Mindy Goldberg fraudulently induced Grady into entering into the Agreement to become a shareholder in USI. Goldberg, Mindy Goldberg and USI knew that these representations were false when made. Goldberg, Mindy Goldberg and USI intended to induce Grady to act upon these misrepresentations and concealments.

41. The representations and concealments by Goldberg, Mindy Goldberg and USI induced Grady into entering into the Agreement to become a shareholder in USI. Grady reasonably and justifiably relied upon the misrepresentations and concealments to his detriment.

42. The misrepresentations and concealments made by Goldberg, Mindy Goldberg

and USI have proximately caused Grady to suffer significant damages.

43. Therefore, Grady seeks compensatory damages in an amount in excess of $75,000.00 representing lost commissions, tax benefits, salary, benefits, patent rights and his ownership interest in the Chinese manufacturing plant plus any and all other appropriate relief that this Court deems just and equitable.

WHEREFORE, based on the above, the Plaintiff, MICHAEL F. GRADY, requests this Court enter Final Judgment in his favor against EDWARD GOLDBERG, MINDY GOLDBERG and UNIVERSAL SOURCING, INC., joint and severally, for any and all consequential, compensatory and special damages and such and further relief as this Court deems just and proper.

MICHAEL F. GRADY
100 Jefferson Drive
E. Greenwich, RI 02818
401-834-9215

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was mailed this 7 day of December, 2007 to: Armando E. Batastini, Esquire and Stephen M. Prignano, Esquire, Edwards, Angell, Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island 02903 and Jay Auslander, Esquire, Joseph Zelmanovitz, Esquire and Natalie Shkolnik, Esquire, Siller, Wilk, LLP, 675 Third Avenue, New York, NY 10017-5714.

MICHAEL F. GRADY, Pro Se
100 Jefferson Drive
E. Greenwich, RI 02818
401-834-9215
mgrady.mfgassociates@cox.net